UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

JAMES LONG,

              Movant,

v.

UNITED STATES OF AMERICA,

              Respondent.

Civil No. 6:23-cv-_____
Crim No. 6:16-cr-00180-RBD-RMN-1

**FILED**

2023 JUN 22 PM 2:

## MEMORANDUM OF LAW IN SUPPORT OF MOTION UNDER 28 U.S.C. § 2255(F)(3) TO VACATE, SET ASIDE, OR CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY

    COMES Movant, JAMES LONG ("Long"), appearing *pro se,* and in support of this memorandum would show as follows:

### I. STATEMENT OF JURISDICTION

    Jurisdiction is vested in this Court under 28 U.S.C. § 2255(f)(3). Under 28 U.S.C. § 2255, federal prisoners "claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States" [may move the district] "court which imposed the sentence to vacate, set aside or correct the sentence." 28 U.S.C. § 2255(a). Section 2255(f) sets forth the one- year statute of limitations for a motion under this section to, in relevant part, "run from the latest of --(1) the date on which the judgment of conviction becomes final; . . . [or] (3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review." 28 U.S.C. § 2255(f). Section 2255(f)(3), however, provides that the one-year limitations period begins to run from "the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made

retroactively applicable to cases on collateral review." 28 U.S.C. §2255(f)(3). See *Spencer v. United States*, 727 F.3d 1076 (11ᵗʰ Cir. 2013); *Dodd v. United States*, 545 U.S. 353, 357-58 (2005) (holding that the one-year limitations period runs "from the date on which the right ... was initially recognized by th[e] [Supreme] Court").

## II. STATEMENT OF THE GROUND FOR REVIEW

Whether, in light of *Ruan v. United States*, 142 S. Ct. 2370 (2022), Long's sentence and conviction must be vacated because his 180-month sentence was driven by his "relevant conduct"– laundering of funds derived from Conspiracy to Distribute Schedule II and III Controlled Substances prescribed by physicians who did not "knowingly or intentionally" support a conviction for unlawful distribution under 21 U.S.C. § 841.

## III. STATEMENT OF THE CASE

### A.    Procedural Background

On September 14, 2016, the United States Attorney sitting in the United States District Court for the Middle District of Florida, Orlando Division, returned a one (1) count Information charging Long. See Doc. 1.[1] Count 1 charged Long with Conspiracy to Commit Money Laundering, in violation of 18 U.S.C. § 1956(h). *Id.* The Information also contained a Forfeiture Allegation pursuant to 21 U.S.C. § 853(p), as incorporated by 18 U.S.C. § 982(b)(1). *Id.*

On October 11, 2016, a Change of Plea Hearing was held and Long entered a guilty on Count 1 of the Information pursuant to written Plea Agreement. See Docs. 3, 26.

---

[1] "Doc." refers to the Docket Report in the United States District Court for the Middle District of Florida, Orlando Division in Criminal No. 6:16-cr-00180-RBD-RMN-1, which is immediately followed by the Docket Entry Number.

On February 2, 2017, Long was sentenced to 180 months' imprisonment, 2 years Supervised Release, no Fine or Restitution, and a Mandatory Special Assessment Fee of $100. See Docs. 65-66.

On July 13, 2020, Long filed a Motion under 28 U.S.C. § 2255 to Vacate, Set Aside or Correct Sentence by a Person in Federal Custody ("§ 2255 Motion"). See Doc. 96; CvDoc. 1.[2]

On August 8, 2020, Long filed an Emergency Motion for Compassionate Release, which was denied on October 21, 2020. See Docs. 97, 110.

On April 27, 2023, the Court issued an Order denying Long's § 2255 Motion and Certificate of Appealability. See CvDoc. 24.

**B.**   **Statement of the Facts**

1.   **Offense Conduct**

The following Factual Basis was stipulated to by Long in his Plea Agreement, as follows:

The Drug Enforcement Administration (DEA), using a variety of investigative techniques, including surveillance, undercover officers posing as patients, and interviews with sources of information, and former employees, determined that, from in or about 2010, to on or about June 14, 2013, Long and others used the Professional Pain Center, located at 860 East State Road 434, Longwood, Seminole County, Florida (the clinic), to conspire to knowingly and intentionally distribute and dispense, and cause the distribution and dispensation of, controlled substances outside the usual course of professional practice and for no legitimate medical purpose, in exchange for monetary gain, primarily cash.

Long, as president and owner of the clinic, employed approximately 10 physicians at the clinic who were willing to write unlawful and invalid prescriptions for Schedule II and Schedule III controlled substances that they issued outside the usual course of professional practice and for no legitimate medical purpose. Two of those physicians were Doctor-1 and Doctor-2.

---

[2]

"CvDoc." refers to the Docket Report in the United States District Court for the Middle District of Florida, Orlando Division in Civil No. 6:20-cv-1245-Orl-37GJK, which is immediately followed by the Docket Entry Number.

A review of Doctor-1's Prescription Monitoring Program (POMP), showed that between December 1, 2010 and December 1, 2011, Doctor-1 wrote approximately 19,685 prescriptions of controlled substances, for approximately 1,247 patients. The patients' ages ranged between 23 to 83 years old, with approximately 56% of the patients younger than 40 years of age and 23% younger than 30 years of age.

The 19,685 prescriptions accounted for approximately 1,538,282 dosage units of Schedule II medication, broken down as follows: 90 dosage units (D.U.) of Hydromorphone, 56 D.U. of Oxymorphone, 56 D.U. of Roxicodone, 325,248 of Oxycodone 15mg, and 1,212,832 of Oxycodone 30mg. The preferred Schedule II medication prescribed by Doctor-1 was Oxycodone, for a total of 1,538,080 D.U. or 12,698 prescriptions, accounting for 65% of the total Schedule II prescriptions. According to the POMP, Doctor-1 expedited approximately 7,275 prescriptions for Oxycodone 30mg, making it the preferred strength, followed by 5,423 prescriptions of Oxycodone 15mg. The preferred Schedule IV medication was Alprazolam, which accounted for 5,755 prescriptions and/or 295,547 dosage units.

A medical expert, who is a board certified anesthesiologist licensed to practice medicine in Florida, after reviewing the breakdowns of controlled substances prescribed by Doctor-1, concluded that they were extraordinarily high and clearly excessive. In two different time periods (December 1, 2010 to December 1, 2011, and December 19, 2012 to June 11 , 2013) Doctor-1 prescribed 1.53 million and 1.55 million units, respectively, of immediate release Oxycodone, in addition to tens of thousands of other Schedule II controlled substances. Doctor-1 prescribed over 300,000 units of Schedule IV drugs in each of those years. According to the medical expert, no physician, in the usual course of his/her professional practice, could possibly prescribe this many units of controlled substances for legitimate medical reasons.

On or about April 24, 2012, the Florida Department of Health filed an Administrative Complaint before the Board of Medicine alleging that Doctor-2 had committed medical malpractice by failing to document a patient's medical record to justify simultaneous prescriptions of Oxycodone, Oxycontin, Soma, and Xanax. It was alleged that Doctor-2 had inappropriately or excessively prescribed Oxycodone, Oxycontin, Soma, and Xanax, in violation of Florida law.

Based on the Administrative Complaint, the Board of Medicine suspended Doctor-2's Florida Medical License and, on or about February 12, 2013, entered into a Stipulation Agreement with Doctor-2. Doctor-2 was ordered to pay a fine of $12,500 and attend two classes. The classes Doctor-2 had to attend were "Prescribing Controlled Drugs: Critical Issues and Common Pitfalls of Misprescribing" and "Quality Medical Records Keeping for Health Care Professionals." Doctor-2 was not allowed to treat patients for chronic and nonmalignant pain, and he was not allowed

4

to prescribe Schedule II and III controlled substances until he successfully completed the drug course.

After reviewing all 69 patient files, the medical expert concluded that Doctor-1, Doctor-2, and at least three other doctors, engaged in a repeated pattern of issuing prescriptions for controlled substances without a legitimate medical reason, outside the usual course of professional practice. The medical expert also indicated that any reasonably prudent physician would not issue such prescriptions for controlled substances in the quantity and combinations prescribed because of the danger of overdose and death coupled with the likelihood of diversion. It was the medical expert's conclusion that the ongoing practice of the above mentioned physicians represented a clear and present Long's Initials danger to the health and welfare of the citizens of Florida, as the physicians were trafficking in controlled substances.

### A. Conspiracy To Engage in Money Laundering

#### 1. *Cash Deposits*

According to the government, the evidence established that virtually all clinic patients paid for office visits, for the purpose of obtaining prescriptions for controlled substances, with cash. A financial investigation covering the period of January 12, 201 O through January 8, 2013 revealed that Long deposited excessive amounts of cash (proceeds of the trafficking of prescription drugs) into the clinic's operating account (Wells Fargo Account ending 8043) and his (and his wife's) personal bank accounts in lieu of the clinic's operating account. Notably, in contrast to that of a legitimate health care provider, the clinic's operating account did not receive a single payment from an insurance company. Instead, all of the approximately $5,570,260.00 in deposits were cash deposits.

In addition, the vast majority of the cash deposits into the clinic and personal accounts were structured to avoid the currency reporting requirements of the Bank Secrecy Act, 31 U.S.C. § 5313 and 31 C.F.R. § 1010.311, particularly the requirement that financial institutions file a Currency Transaction Report (CTR) for each deposit of more than $10,000 by, through or to such financia institutions. To avoid the filing of a CTR, Long and his co-conspirators would make multiple cash deposits on the same day in amounts less than $10,000, but with an aggregate value in excess of $10,000, in violation of 31 U.S.C. § 5324(a). Between June 7, 2010 and December 17, 2012, there were 1,043 cash deposits into the clinic's operating account totaling approximately $5,570,260. Approximately 80% of the deposits (843 cash deposits), totaling $4,049,832.01, were either deposited by the same individual, or multiple individuals, on the same day, and if aggregated would have exceeded

5

$10,000. On the same day and/or on consecutive days as cash was deposited into the clinic's operating account, approximately $657,357 in additional cash deposits were made into Long's personal accounts.

The aforementioned practices demonstrate that Long knew that the proceeds obtained through the operation of the clinic were proceeds obtained from an unlawful activity, specifically a conspiracy to distribute and dispense, and cause the distribution and dispensing of, controlled substances. By depositing monies into his personal accounts in lieu of the clinic's operating account, and structuring such deposits (as well as the cash deposits into the operating account), Long intended to conceal the source of the money obtained by illicit means and avoid the currency reporting requirements of the Bank Secrecy Act. Indeed, a legitimate business would first deposit proceeds obtained from its operation into its operating account, and not directly into the personal accounts of the operators of the business. In addition, as will be discussed below, to further conceal the nature, source and location of the proceeds obtained from the clinic, Long and his co-conspirators commingled the proceeds obtained from the clinic with monies obtained from other companies - legitimate (J & L Masonry, Inc.) and legitimate on their face (Bones & Brew d/b/a Beef 'O' Brady's and BMS Enterprises, LLC) - in order to give legitimacy to the otherwise illegitimate funds.

Between 2010 and 2012, Long and his wife drew approximately $1.7 million in salaries from the target clinic in addition to the $657,357 in cash deposits discussed above. In 2011 and 2012, they also received a total of $120,550 from BMS Enterprises LLC, Bones & Brew Inc., and J & L Masonry, Inc. While the $36,000 from J & L Masonry, Inc. is not tainted by any connection to the clinic or its illicit proceeds, the Long's investment in the other two companies is traceable to clinic proceeds. Therefore, any monies they obtained from Bones & Brew and BMS Enterprises, LLC are involved in their concealment money laundering.

### 2. *Bones & Brew*

Between January 1, 2011 and July 28, 2011, there was $34,347.21 deposited into JP Morgan Chase Account #XXXXX9885 held by Long. All of the funds deposited into this account during this time frame appear to be proceeds obtained from the operation of the clinic; specifically, the deposits were of payroll checks from the clinic to Long ($20,544.90), his wife ($11,164.06) and another clinic employee ($2,638.25). On May 27, 2011, Long wrote a $20,000 check from the account to "Kurt Lorenzini" to purchase an interest in Bones & Brew d/b/a Beef 'O' Brady's. The memo line of the check said "purchase of beers." Thereafter, on or about June 27, 2011, Long and his wife began to receive payroll checks from Bones & Brew.

According to FLDSD's records, Lorenzini was the owner of Bones & Brew until August 12, 2011, when he resigned as the President of the company. Subsequently, on October 5, 2011, Long became the President and his wife became the Treasurer of the company. The funds Long and his wife received from Bones & Brew are investment income and salary from actually working at the restaurant.

### 3. *BMS Enterprises*

On March 28, 2011, Long and his wife established BMS Enterprises, LLC and serve as its sole managing members. BMS Enterprises was established to manage several rental real estate properties purchased by Long and his wife with proceeds obtained from or traceable to the illicit operation of the clinic. Specifically, all of the real property subject to forfeiture, except for the property located at 765 Hall Street, are rental properties managed by BMS Enterprises, LLC. Interestingly, even though BMS Enterprises has a business bank account at SunTrust Bank, Long deposits rent checks into their personal accounts. The purchase of each of the rental properties involved monetary transactions knowingly conducted with more than $10,000 in criminal proceeds, in violation of 18 U.S.C. § 1957.

For instance, JP Morgan Chase, NA Savings Account #XXXXXX7996 held in the name of Long was opened on August 18, 2010 with a $500.00 cash deposit. Long was the only signature authority on the account. From August 19, 2010 through December 31, 2010, approximately $130,789.26 was deposited into this account. All but $50 of the deposits are directly traceable to the clinic. Long deposited 10 payroll checks from the clinic, totaling $29,239.26, as well as approximately $101,000 in clinic proceeds through 21 cash deposits.

From January 1, 2011 until July 13, 2011, when NA Savings Account #XXXXXX7996 was closed, approximately $172,285.71 was deposited into this account. Long deposited 22 payroll checks from the clinic, totaling $71,287.71, as well as $98,600 in clinic proceeds through 22 cash deposits. The only deposits not related to the clinic were 7 checks from J & L Masonry totaling $2,398.00.

In 2011, Long and his wife purchased the real properties located at 742 Donau NW, Palm Bay, FL, 1690 Sawgrass Drive SW, Palm Bay, FL, and 117 Circle SE, Palm Bay, FL with funds from NA Savings Account #XXXXXX7996.

On January 18, 2011, Long signed a contract to purchase 117 Circle SE, Palm Bay, Florida for $164,000. The closing was conducted by Peninsula Title Services, LLC on January 31, 2011. On January 29, 2011, Long obtained a cashier's check in the amount of $79,432.08 from NA Savings Account #XXXXXX7996. On January 29, 2011, Long's wife obtained a cashier's check in the amount of $80,000 from Wachovia Bank Account #XXXXXXXXX2157 held jointly by the Long's, which was also funded with clinic proceeds. Both checks, which totaled $159,432.08, were used to complete the purchase of this property.

On March 25, 2011, the Long signed a contract to purchase 742 Donau Avenue NW, Palm Bay, Florida for $45,000.00. On March 31, 2011, Long wire transferred $43,433.69 from NA Savings Account #XXXXXX7996 to Peer Title in order to complete the purchase of this property. The property was titled in the name of BMS Enterprises, LLC.

On May 25, 2011, Long and his wife signed a contract to purchase 1690 Sawgrass Drive SW, Palm Bay, Florida for $115,000. On June 29, 2011, James obtained a cashier's check in the amount of $112,673.83 made payable to Alliance Title Insurance Agency from NA Savings Account #XXXXXX7996 in order to complete the purchase of this properiy. On October 26, 2011, a Quit Claim Warranty Deed was filed transferring this property from the Long's to BMS Enterprises, LLC.

Also on October 26, 2011, a Quick Claim Warranty Deed was filed transferring the 117 Circle SE property from LONG to LONG and his wife. They lived in this property until they purchased the property located at 765 Hall Road.

See Doc. 3 at 21-33.

### 2.   Plea Proceedings

On October 11, 2016, a Change of Plea Hearing was held before Magistrate Judge Gregory J. Kelly. See Doc. 26. Long entered a guilty plea on Count 1 of the Information pursuant to written Plea Agreement. See Doc. 3. In return of his guilty plea, the government recommended a 3-level reduction for his acceptance of responsibility pursuant to USSG §§ 3E1.1(a) and (b). *Id.* The case

was referred to U.S. Probation Office for the preparation of the PSR.[3]

### 3.    Presentence Report Calculations and Recommendations

The U.S. Probation Office prepared Long's PSR. The 2016 Guidelines Manual, incorporating all guideline amendments, was used to determine Long's offense level pursuant to USSG § 1B1.11. See PSR ¶ 56.  Count 1: Conspiracy to Commit Money Laundering calls for an offense level of 38 because the underlying offense from which the laundered funds were derived from Conspiracy to Distribute Schedule II and III Controlled Substances involving 243,779.23 Kilograms of Marijuana, pursuant to USSG § 2D1.1(c)(1). See PSR ¶ 58. Long received: a 2-level increase for maintaining premises for the purpose of manufacturing or distributing a controlled substance, pursuant to USSG § 2D1.1(b)(12); and another 2-level increase because Long committed the offense as part of a pattern of criminal conduct engaged in as a livelihood, pursuant to USSG § 2D1.1(b)(15)(E). *Id.* Therefore, the Base Offense Level was 42, pursuant to USSG § 2S1.1(a)(1). *Id.* Additionally, Long received a 2-level increase since he was convicted under 18 U.S.C. § 1956(h), pursuant to  USSG § 2S1.1(b)(2)(B). See PSR ¶ 59. Also, Long received a 3-level increase for his manager or supervisor role, pursuant to  USSG § 3B1.1(b). See PSR ¶ 61. The PSR calculated Long's Adjusted Offense Level to be 47. See PSR ¶ 63. Long received a three (3) level reduction for acceptance of responsibility, pursuant to USSG §§ 3E1.1(a) and (b). See PSR ¶¶ 65-66. Pursuant to USSG § 5 comment (n.2), an offense level of more than 43 is to be treated as an offense level 43 which yields Long's Total Offense Level to be 43. See PSR ¶¶ 68-69. Long's total criminal history points of zero (0), placed him in Criminal History Category I. Based upon a Total Offense Level of 43 and a Criminal History Category of I, the guidelines imprisonment range was Life.

---

[3]

"PSR" refers to the Presentence Report, which is immediately followed by the paragraph ("¶") number.

4.   <u>Sentencing Proceeding</u>

Prior to sentencing, Long's attorney filed a Sentencing Memorandum. See Doc. 51. In that memorandum, Long informed the Court that he was only a small part of a much piece of a much larger conspiracy involving others who were more culpable that he was. The purpose of the memorandum was to give the Court more detail with respect to the statutory framework for its analysis, the nature of the offense at issue, and the nature and character of Long himself, and respectfully requested that the Court consider the matters addressed therein to exercise its most important discretion in its sentencing of Long.

On January 9, 2017, an initial sentencing hearing was held. However, the Court had many reservations about the sentencing. The Court had concerns that it was being asked to sentence one of the conspirators but it was not made aware of the scope of the conspiracy and could not do its job properly. As such, the Court reset the sentencing until it had more information about the conspiracy.

On February 2, 2017, the Court held a second sentencing hearing. At the beginning of this hearing, the Court inquired whether there were any objections either the facts or the computation of the guidelines? A Brian Phillips ("Phillips"), Long's defense counsel, replied that were not any objections to the PSR.

The government called as a witness Special Agent Keith Charles Whitmore ("Whitmore"), the case agent in this case. Most of the rest of the hearing was spent with Whitmore testifying so that the Court could get a better scope of the conspiracy and the involvement of Long. Whitmore's testimony certainly made Long look like he was the most culpable in the conspiracy even though it was shown that he left the day-to-day operation of the conspiracy in 2011, and that there were between 10 to 12 licensed doctors involved. After Whitmore concluded his testimony. The

prosecutor, Ms. Rivera Miranda ("Miranda"), admitted that Long was cooperating and that he was the first one to plead guilty in this case. However, she further stated that the government had not filed § 5K.1 motion at this point because it's not ripe considering what may happen in the future.

Based on the input from *Miranda* at sentencing, the government intended at some point to file a downward departure for substantial assistance, which could have been done under a Rule 35(b) of the Federal Rules of Criminal Procedure up to one year after he was sentenced. However, to date that has not happen.

At the Sentencing Hearing held on February 2, 2017 before Judge Roy B. Dalton, Jr. See Doc. 65. Long was sentenced to 180 months' imprisonment, followed by a 2-year Supervised Release. See Doc. 66. The Court also ordered a Mandatory Special Assessment Fee of $100. *Id.* Because he waived his right to appeal his sentence in his Plea Agreement, Long did not file for a direct appeal with the Eleventh Circuit.

5.    Postconviction Proceeding

On July 13, 2020, Long filed a § 2255 Motion wherein, he raised four grounds of ineffective assistance of counsel based on counsel's (1) failure to investigate the pain clinic and discover the roles of co-conspirators, which would have established Long's involvement was minor and prevented counsel from convincing Long to plead guilty (Ground One); (2) conflict of interest-namely, Long's inability to pay counsel additional fees because his account was seized by the Government - during the pretrial stages, which caused him to enter a plea earlier than he should have and resulted in a harsher sentence (Ground Two); (3) failure to assist Long in allocuting at the sentencing hearing (Ground Three); and (4) failure to file a notice of appeal where "the Court's final order contradicted its stipulations and instructions given to the Government at [Long's] sentencing

11

hearing" and failure to ensure the statute of limitations did not expire before Long's co-conspirators were charged, which resulted in a flawed strategy to pursue substantial assistance under Rule 35 (Ground Four). See CvDoc. 9 at 1-20. According to the Court, the facts supporting Grounds One through Three could have been discovered with the exercise of due diligence by February 16, 2017, the date Long's conviction became final. One year from June 29, 2018, was Saturday, June 29, 2019. Thus, if Long's limitation period began to run on June 29, 2018, then he would have had through July 1, 2019, to timely file a § 2255 motion. Accordingly, the Court concluded that Long was not entitled to equitable tolling, and his motion was untimely. *Id.*

## IV. DISCUSSION

As a preliminary matter, Long respectfully requests that this Court be mindful that *pro se* pleadings are to be construed liberally. See *Albra v. Advan, Inc.*, 490 F.3d 826 (11th Cir. 2007) (per curiam); *Caldwell v. Warden,* 748 F.3d 1090 (11th Cir. 2014); *Estelle v. Gamble*, 429 U.S. 97 (1976); and *Haines v. Kerner*, 404 U.S. 519 (1972)(same).

### Constitutional Law: Retroactivity

While there appear to be no United States Supreme Court decisions adopting a different analysis for substantive criminal matters, some courts have held that if a new constitutional pronouncement is substantive, it is generally presumed to apply retroactively to cases on collateral review. See *United States v. Mandanici*, 205 F.3d 519, 525 (2d Cir. 2000).

In *Holt v. United States*, 843 F.3d 720 (7th Cir. 2016), the Court held that substantive decisions such as *Mathis* presumptively apply retroactively on collateral review. See, e.g., *Davis v. United States*, 417 U.S. 333, 94 S.Ct. 2298 (1974); *Montgomery v. Louisiana*, 136 S.Ct. 718 (2016).

12

In *Welch v. United States*, 136 S. Ct. 1257 (2016), the Supreme Court held that Johnson's holding applies retroactively to prisoners seeking collateral relief for ACCA sentences. *Id.* at 1265. The Court explained that "[a]fter *Johnson*, the same person engaging in the same conduct is no longer subject to the [ACCA] and faces at most 10 years in prison." *Ibid.* Because "*Johnson* affected the reach of the underlying statute," the Court concluded that it was "a substantive decision" that, under this Court's retroactivity doctrine, applies retroactively on collateral review. *Ibid.*

States Must Give Effect to New Substantive Rules When a new substantive rule of constitutional law controls the outcome of a case, the Constitution requires state collateral review courts to give retroactive effect to that rule. *Montgomery v. Louisiana*, Case No. 14-280 (S. Ct. 1/25/16).

New substantive rules include, for example, decisions that narrow the scope of a criminal statute by interpreting its terms and constitutional determinations that place particular conduct or persons covered by the statute beyond the State's power to punish. Although the rule about substantive rules is sometimes characterized as a *Teague* exception, such a rule is simply not subject to the *Teague* retroactivity bar. The principle that this type of substantive rule applies retroactively is independent of *Teague* - it arises from the Constitution. *Mays v. U.S.*, Case No. 14-13477 (11th Cir. 3/29/16).

- *Begay* Represents a Substantive Change in the *Law Bryant v. Warden*, FCC Coleman, 738 F.3d 1253 (11th Cir. 2013)
- New substantive rules generally apply retroactively. *Schriro v. Summerlin*, Case No. 03-526 (S. Ct. 6/24/04)
- When a decision of the Supreme Court results in a new rule, that rule applies to all criminal cases still pending on direct review. *Schriro v. Summerlin*, Case No. 03-526 (S. Ct. 6/24/04)
- S.C. Decisions Re: Substantive Law Retroactive Decisions of the Supreme Court construing substantive federal criminal statutes must be given retroactive effect. *U.S. v. Peter*, Case No. 01-16982 (11th Cir. 10/28/02)

**In light of _Ruan v. United States_, 142 S. Ct. 2370 (2022), Long's Sentence and Conviction must Be Vacated Because His 180-month Sentence Was Driven by His "Relevant Conduct"– Laundering of Funds Derived From Conspiracy to Distribute Schedule II and III Controlled Substances Prescribed by Physicians Who Did Not "Knowingly or Intentionally" Support a Conviction for Unlawful Distribution under 21 U.S.C. § 841.**

Here, Long's 180-month sentence was driven by his "relevant conduct." Long's relevant conduct states that he laundered funds derived from Conspiracy to Distribute Schedule II and III Controlled Substances involving 243,779.23 kilograms of marijuana, pursuant to USSG § 2D1.1(c)(1). See PSR ¶ 58.

Recently, the Supreme Court in _Ruan v. United States_, 142 S. Ct. 2370 (2022) held that when a criminal defendant is authorized to dispense controlled substances — such as a doctor who may lawfully prescribe medications — prosecutors must prove beyond a reasonable doubt that the defendant intended to act or knew he or she was acting in an unauthorized manner by distributing substances to support a conviction for unlawful distribution under 21 U.S.C § 841.

On June 27, 2022, the U.S. Supreme Court issued an important decision for doctors who have been convicted of violating the federal Controlled Substances Act in connection with the nation's opioid crisis. In _Ruan_, the Supreme Court overturned two doctors' convictions under the Controlled Substances Act, ruling that the trial courts improperly applied lowered burdens of proof proposed by the U.S. Department of Justice (DOJ).

Specifically, the doctors were convicted under 21 U.S.C. Section 841. This law makes it a federal crime, "[e]xcept as authorized[,] . . . for any person knowingly or intentionally . . . [to] dispense . . . a controlled substance." 21 C.F.R. Section 1306.04(a) grants authorization for registered doctors to dispense prescribed controlled substances—provided that the prescription is,

14

"issued for a legitimate medical purpose by an individual practitioner acting in the usual course of [the practitioner's] professional practice."

At the trial level, the DOJ secured a conviction in each of the underlying cases by relying, in part, on 21 U.S.C. Section 885. Subsection (a)(1) of this law states:

> "It shall not be necessary for the United States to negative any exemption or exception set forth in this subchapter in any complaint, information, indictment, or other pleading or in any trial, hearing, or other proceedings under this subchapter, and the burden of going forward with the evidence with respect to any such exemption or exception shall be upon the person claiming its benefit."

Based on this language, the DOJ argued that the requirement to prove that a doctor acted "knowingly and intentionally" under Section 841 does not apply to the element of authorization. In other words, the DOJ sought—successfully at the trial level—to prosecute without evidence that the defendant doctors knowingly or intentionally prescribed numerous opioid prescriptions without authorization under 21 C.F.R. Section 1306.04(a) (i.e., due to the drugs not being used for legitimate medical purposes). However, this is not what Section 885 is intended to do. As the Supreme Court explains in *Ruan v. United States*:

> "Section 885 simply absolves the Government of having to allege, in an indictment, the inapplicability of every statutory exception in each Controlled Substances Act prosecution. Section 885 also shifts the burden of production—but not the burden of persuasion—regarding statutory exceptions to the defendant."

In *Ruan*, the DOJ also sought to impose a reduced standard for determining whether dispensing opioids without authorization rises to the level of a criminal offense under the Controlled Substances Act. The Supreme Court rejected this effort as well. Explaining the Court's reasoning, Justice Breyer writes:

> "Resisting the 'knowingly or intentionally' standard, the Government instead [argues] we should read the statute as implicitly containing an 'objectively reasonable good-faith effort' or 'objective honest-effort standard.' . . . That is to say, once a

defendant meets his or her burden of production [to establish authorization to prescribe], the Government can convict 'by proving beyond a reasonable doubt that [the defendant] did not even make an objectively reasonable attempt to ascertain and act within the bounds of professional medicine.'"

The Opinion then goes on to bluntly state, "We are not convinced."

In rejecting the government's effort to impose a "good-faith effort" or "objective honest-effort" standard in opioid prescription cases, the Supreme Court relied on four primary justifications:

- **The Presumption of Scienter** – There is a presumption of scienter (or a requirement for a culpable mental state) in criminal proceedings at the federal level. Justice Breyer writes, "The presumption of scienter applies even when a statute does not include a scienter provision, and when a statute does 'includ[e] a general scienter provision,' 'the presumption applies with equal or greater force' to the scope of that provision."

- **The Plain Language of the Statute** – As the Supreme Court notes, the plain language of Section 841 does not contain the "good-faith effort" or "objective honest-effort" standards that the federal government sought to impose at the trial level. Instead the statute "uses the familiar mens rea words 'knowingly and intentionally,'" so these are the standards that should apply.

- **The Government's Attempt to Shift Focus from the Doctor's Actual Mental State to a Hypothetical Standard** – The Supreme Court notes that the Government's standards would shift the focus of criminal prosecution under Section 841 from the defendant doctors' actual mental state to, "the mental state of a hypothetical 'reasonable' doctor." While this standard is often applied in civil medical malpractice litigation, using this standard under Section 841 would be inconsistent with fundamental principles of criminal jurisprudence.

- **Rejection of Analogous Suggestions in Prior Cases** – Justice Breyer also writes that the Court has "rejected analogous suggestions in other criminal contexts." He then gives the example of Elonis v. United States, 575 U.S. 723 (2015), in which the Court held that "[h]aving liability turn on whether a 'reasonable person' regards [a] communication as a threat—regardless of what the defendant thinks—reduces culpability on the all-important element of the crime to negligence," and further emphasized that it has, "long been reluctant to infer that a negligence standard was intended in criminal statutes."

16

In short, the Supreme Court resoundingly rejected the DOJ's efforts to prosecute doctors for routinely prescribing controlled substances or medically-unnecessary opioids without evidence that the doctors either knew or intended to issue the prescriptions despite this lack of medical necessity. Ultimately, the Supreme Court concluded:

> "[Section] 841's 'knowingly or intentionally' mens rea applies to the 'except as authorized' clause. This means that in a §841 prosecution in which a defendant meets his burden of production under §885 [to establish that the 21 C.F.R. Section 1306.04(a) authorization applies], the Government must prove beyond a reasonable doubt that the defendant knowingly or intentionally acted in an unauthorized manner."

The question in *Ruan* was:

> Whether a physician alleged to have prescribed controlled substances outside the usual course of professional practice may be convicted of unlawful distribution under 21 U.S.C. § 841(a)(1) without regard to whether, in good faith, he "reasonably believed" or "subjectively intended" that his prescriptions fall within that course of professional practice.

Since apparently the physicians in this case were never charged in the conspiracy, and they were the only ones that could prescribe the pills, what was the illegal source of the money Long allegedly laundered? Long was not charged with tax evasion. If the government could prove that the physicians prescribed controlled substances outside the usual course of professional practice, why have the physicians not been charged in the conspiracy?

Section 2255(f)(3) provides that the one-year limitations period begins to run from "the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review." 28 U.S.C. § 2255(f)(3). See *United States v. Olvera*, 775 F.3d 726 (5th Cir. 2015); *Dodd v. United States*, 545 U.S. 353, 357-58 (2005) (holding that the one-year limitations period runs

17

"from the date on which the right ... was initially recognized by th[e] [Supreme] Court"). Pursuant

to *Ruan*, which was decided on June 27, 2022, Long's claims are now timely.

Furthermore, Long argues that the same reasoning in *Ruan* should apply to his case due to

the following reasons:

1. *Money Laundering Conspiracy*. It was stated on the Information that Long was indicted

with:

> "the defendant herein, did knowingly and voluntarily combine, conspire, confederate
> and agree with other known and unknown persons, to commit the following offenses
> against the United States:
>
>> (a) to knowingly conduct and attempt to conduct a financial transaction,
>> which affected interstate and foreign commerce, involving the proceeds of a
>> specified unlawful activity, that is, conspiracy to distribute and dispense, and
>> cause the distribution and dispensing of, controlled substances, in violation
>> of Title 21, United States Code, Sections 841 (a)(1) and 846 and Title 18,
>> United States Code, Section 2, knowing that the funds involved in the
>> financial transaction represented the proceeds of some form of unlawful
>> activity, and knowing that the transaction was designed in whole and in part
>> to conceal and disguise the nature, location, source, ownership, and control
>> of the proceeds of specified unlawful activity, contrary to Title 18, United
>> States Code, Section 1956(a)(1)(B)(I);
>>
>> (b) to knowingly conduct and attempt to conduct a financial transaction,
>> which affected interstate and foreign commerce, involving the proceeds of a
>> specified unlawful activity, that is, conspiracy to distribute and dispense, and
>> cause the distribution and dispensing of, controlled substances, in violation
>> of Title 21, United States Code, Sections 841(a)(1) and 846 and Title 18,
>> United States Code, Section 2, knowing that the funds involved in the
>> financial transaction represented the proceeds of some form of unlawful
>> activity, and knowing that the transaction was designed in whole and in part
>> to avoid a transaction reporting requirement under State and Federal law,
>> contrary to Title 18, United States Code, Section 1956(a)(1)(B)(ii); and
>>
>> (c) to knowingly engage and attempt to engage in a monetary transaction,
>> within the United States, which affected interstate commerce, in criminally
>> derived property of a value greater than $10,000.00, which property was
>> derived from a specified unlawful activity, that is, conspiracy to distribute

and dispense, and cause the distribution and dispensing of, controlled substances, in violation of Title 21, United States Code, Sections 841(a)(1) and 846 and Title 18, United States Code, Section 2, knowing that the transaction involved property and funds that were the proceeds of some criminal activity, contrary to Title 18, United States Code, Section 1957.

All in violation of Title 18, United States Code, Section 1956(h)."

To elaborate, the section was defined as:

Section 1956 (h): Any person who **conspires** to commit any offense defined in this section [or section 1957] shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy.

A conviction for conspiracy to violate the section requires the government to prove: **"(1) there was an agreement between two or more persons to commit money laundering and (2) that the defendant joined the agreement knowing its purpose and with the intent to further the illegal purpose."** Section 1956(h) creates a crime which requires no proof of an overt act in furtherance of the conspiracy. In addition to the conspiracy offense, conspirators are liable for the foreseeable offenses committed by co-conspirators in furtherance of the scheme. Those who aid or abet the money laundering of another are likewise liable as though they had committed the offense themselves.

In this case, Long was incorrectly charged with the conspiracy offense because: (1) he was a sole defendant as stated on the Information, (2) there was no related evidence that he agreed to someone to commit the conspiracy, and (3) none of the medical experts, who engaged in issuing prescriptions for controlled substances without a legitimate medical reason, were charged of any offense related to the money laundering conspiracy.

2. *2-level Enhancement.* Since Long was charged with Money Laundering Conspiracy, he also received a 2-level enhancement pursuant to USSG § 2S1.1(b)(2)(B). This Court was unable to present the direct connection of this enhancement to the alleged drugs activities associated to Long. It is essential to note that, (1) **Long was not charged of any controlled substance offense,** (2) it was not him who prescribed the alleged controlled substances, and (3) Long was never charged of

19

tax evasion for alleged laundered money. Thus, Long did not deserve this enhancement and it should be removed.

3. *3-Level Enhancement*. Long received an additional three (3) level enhancement because it was believed that Long was a manager or supervisor (but not an organizer of leader). See USSG §3B1.1(b). As discussed above, Long was the only defendant in this conspiracy. The Court failed to indicate whom Long had conspired with to become a manager or supervisor. Because of this, it defeated the purpose of charging Long with conspiracy when he did not have any co-conspirators at all. Thus, the 3-level role enhancement should not have been imposed.

In sum, *Ruan* is substantially relevant in regard to Long's arguments, making clear indication that Long' sentence and conviction based off of physicians prescribing controlled substances outside the usual course of professional practice, in violation of 21 U.S.C. § 841, requires that the physician(s) "knowingly or intentionally" acted in an unauthorized manner, in light of *Ruan*. But then again, the doctors who prescribed the controlled substances were not included in the alleged conspiracy, which triggered the application of multiple enhancements and Long's conviction. The doctors did not "knowingly or intentionally" authorized the prescription of the controlled substances. Thus making him innocent of the money laundering conspiracy.

## VI. CONCLUSION

For the above and foregoing reasons, Long's sentence should be vacated for resentencing in light of *Ruan*. In the alternative, an evidentiary hearing should be held so that Long may further prove his meritorious ground for relief, resolve disputed facts between the parties, and expand an incomplete record.

Respectfully submitted,

Dated: June 14, 2023.

JAMES LONG
REG. NO. 68216-018
FCI COLEMAN LOW
FEDERAL CORR. INSTITUTION
P.O. BOX 1031
COLEMAN, FL 33521
Appearing *Pro Se*

21